IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

VERONICA ALVAREZ,

    Plaintiff,

v.                                                   CV 13-393 MV/WPL

CAROLYN W. COLVIN, *Acting
Commissioner of the Social Security
Administration*,

    Defendant.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

Veronica Alvarez filed an application for Supplemental Security Income ("SSI") on February 23, 2010. (Administrative Record ("AR") 25.) She alleges disability beginning January 1, 2006, due to bipolar disorder with psychotic features, posttraumatic stress disorder ("PTSD"), and severe anxiety. (AR 144, 161.) Administrative Law Judge ("ALJ") David R. Wurm held a disability hearing on April 2, 2011. (AR 39-63.) On September 20, 2011, the ALJ determined that Alvarez was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits. (AR 25-35.) Alvarez filed an appeal with the Appeals Council, but the Council declined her request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-5.)

Alvarez sought review of the SSA's decision (Doc. 1) and filed an opposed Motion to Reverse and Remand for a Rehearing (Doc. 18). The Commissioner of the SSA ("Commissioner") responded (Doc. 24), and Alvarez filed a reply (Doc. 25). After having read

and considered the entire record and the relevant law, I recommend that the Court grant Alvarez's motion and remand this case to the SSA for proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that []he has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. § 416.920(a)(4) (2014). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. § 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to those

in the Listing of Impairments, then the ALJ determines the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. § 416.920(e). At the fourth step, the ALJ compares the claimant's RFC with the functional requirements of his past relevant work to see if the claimant is still capable of performing his past work. *See* 20 C.F.R. § 416.920(f). If a claimant is not prevented from performing his past work, then he is not disabled. *Id.* The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987). If the claimant cannot return to his past work, then the Commissioner bears the burden, at the fifth step, of showing that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Alvarez is a forty-one-year-old woman with a tenth-grade education. (AR 129, 162.) Between the years 1992 and 2009, she worked as a cashier in various retail stores, as an elderly care provider, and as a makeup artist. (AR 163.)

The first record in the AR dates back to December 15, 2005, when Alvarez gave birth to a son. (AR 223-24.) The record indicates that Alvarez had a history of drug and alcohol abuse, but that she denied recent use. (AR 224.)

On October 1, 2006, Alvarez was voluntarily admitted to Lovelace Medical Center ("Lovelace") for suicidal ideation after alcohol intoxication. (AR 221.) The record states that Alvarez had a history of alcohol usage, in the form of a 12-pack of beers twice a week. (*Id.*) Alvarez was diagnosed with bipolar disorder, PTSD, and psychotic episodes. (*Id.*) A separate

record from the same admittance states that Alvarez drank about once a week until she either passed out or ran out of alcohol. (AR 217.) This pattern of drinking had taken place for about thirteen years. (*Id.*) On this occasion, Alvarez tried cutting her wrists. (*Id.*) During a mental status evaluation, Alvarez was found to be fully alert and oriented, somewhat tired, cooperative, coherent, and severely depressed, with adequate insight and judgment. (*Id.*) George M. Baca, M.D., diagnosed her with bipolar disorder, alcohol dependence, and a severe level of stress, with a GAF upon admittance of 25.[1] (AR 218.) She was given Depakote ER for bipolar disorder, and she showed gradual improvement throughout the hospitalization. (AR 217-18.) Dr. Baca wrote that Alvarez's prognosis was likely good as long as she could maintain sobriety and remain in outpatient treatment. (AR 218.) Alvarez agreed to outpatient substance abuse treatment and requested discharge from the hospital so that she could take care of her children. (AR 218.) She was subsequently discharged, with a discharge GAF of 55.[2] (*Id.*)

On February 25, 2008, Alvarez was admitted to Lovelace for chest pain and associated panic attacks. (AR 213-15.) Alvarez had open heart surgery at the age of twenty-one months. (AR 215.) The record states that Alvarez had not consumed alcohol in five months. (*Id.*) She was diagnosed with mild pulmonary stenosis and moderate pulmonic regurgitation. (AR 213.) In September 2008, Alvarez received a cardiac clearance and underwent a left foot bunionectomy with distal first metatarsal osteotomy. (AR 207-12.)

---

[1] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005). A score between twenty-one and thirty is assessed when the patient is believed to have "[b]ehavior . . . considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas." *Id.* Although the fifth edition of the *DSM* dropped the GAF rating in 2013 in favor of an alternative assessment schedule, Alvarez's mental health providers used this scoring method.

[2] A score between fifty-one and sixty is assessed when the patient is believed to have "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34.

Alvarez began seeing Shannon Grant, LPCC, at the Family Workshop on November 25, 2009. (AR 233.) According to the record, Alvarez was court-ordered to attend counseling for alcohol abuse. (AR 240.) Alvarez received a DWI a year prior, and she relapsed to alcohol use two weeks before seeing Grant. (AR 235.) Alvarez used alcohol to self-medicate. (AR 233.) She experienced manic and depressive moods and had a difficult time resolving conflict. (*Id.*) During sessions on January 13 and January 20, 2010, Alvarez presented with a manic mood. (AR 230-31.)

On January 20, 2010, Alvarez also visited the Sage Neuroscience Center ("Sage"). (AR 252-55.) Alvarez reported that her depression comes and goes and that she gets panic attacks five to six times a day. (AR 252.) Her mood was "Ok," and her affect was labile, from bright to angry. (AR 254.) Alvarez's speech was pressured, loud, very rapid, linear, difficult to interrupt, and included anxious content. (*Id.*) Alvarez reported that she heard or saw "spirits." (AR 255.) She also experienced poor sleep. (*Id.*) Approximately two weeks later, Alvarez had a slight improvement in mood but reported continued poor sleep. (AR 251.)

Alvarez began seeing Marni Goldberg, LPCC, on February 10, 2010, for individual sessions at the Family Workshop. (AR 227.) Goldberg wrote that Alvarez seemed more centered and was maintaining progress toward stable goals. (*Id.*) Goldberg and Alvarez discussed Alvarez's feeling of being full of anger all of the time. (*Id.*) Alvarez reported hallucinations during sleep hours. (AR 228.) Alvarez was "energetic and nervous, but mentally clear." (*Id.*) She discussed her family, noting her father's alcoholism and trauma from the Vietnam War. (*Id.*) Alvarez's goal was to develop coping skills for when she experienced mood swings. (AR 241.)

On February 17, 2010, at Sage, Alvarez reported that her medications were helping her be calmer. (AR 250.) She stated that her children were taken away by the New Mexico Children,

5

Youth and Families Department and sent to live with a cousin. (*Id.*) Two weeks later, she reported waking three times a night, sweating, and with night terrors. (AR 249.) Alvarez missed her next appointment at Sage and returned on April 7, 2010, depressed, experiencing poor sleep, and completely out of her medications. (AR 248.)

In a Function Report on April 5, 2010, Alvarez reported:

> I usually stay in bed and think about my life and start to cry. I want to be in the dark. I don't want to be around people. I take out my mood on people. I get out of bed to eat or watch t.v. I try to find reasons to be mad. The only reason I leave the house is to go to appointments. When I am in a manic phase, I think that everyone hates me.

(AR 173.) She stated that when she is depressed, she has to force herself to bathe, while when she is in a manic phase, she cleans all day. (AR 174-75.) However, she took care of her children and cooked. (AR 174.) She reported that she does not drive because she feels anxious, that she does not handle stress or changes in routine well, and that she cannot concentrate in order to complete anything or understand what people or telling her. (AR 178-79.)

On May 25, 2010, Ann Ortiz, M.D., performed a consultative psychiatric exam. (AR 256-60.) Dr. Ortiz noted Alvarez's statement that her energy goes up and down. (AR 256.) Alvarez admitted being able to care for herself; shop; cook; clean; bend; stoop; crouch; sit; stand; walk short and long distances; and reach, handle, and grasp, lifting up to twenty to fifty pounds repeatedly with adequate rest in an eight-hour day. (AR 256.) With respect to alcohol use, Alvarez stated,

> Ahhh God. Well there would be periods that I didn't drink. Then I drank so I didn't want to feel I guess and not think about things that have happened and now I am trying to deal with things straight. I drank heavy from 21 [years old] up until 2 years ago. I could still drink, but I got 2 DWI's and I know I have to take medication.

(AR 257.) As to whether she was currently drinking, Alvarez said "[n]o[,] because there is no such thing as drink a little bit." (*Id.*) Dr. Ortiz found that Alvarez was cooperative and clean, with good memory and attention and an average IQ. (AR 258.) Dr. Ortiz diagnosed Alvarez with major depression, recurrent mild; alcohol dependence sustained full remission; alcohol induced mood disorder; alcohol induced anxiety disorder; alcohol induced sleep disorder; and a GAF of 65.[3] (AR 259.) Dr. Ortiz also found that Alvarez is mildly limited in her ability to concentrate and persist at tasks. (*Id.*)

On July 16, 2010, Elizabeth Chiang, M.D., completed a Psychiatric Review Technique form. (AR 261-74.) Dr. Chiang found that Alvarez suffers from major depression and alcohol-induced mood disorder. (AR 264.) Dr. Chiang also found mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (AR 271.) Dr. Chiang opined that the mental limitations Alvarez reported in her function report were greater than those apparent from the record, and Dr. Chiang recommended giving controlling weight to the consultative exam by Dr. Ortiz. (*See* AR 273.) In a Case Analysis dated September 10, 2010, Charles Mellon, M.D., affirmed Dr. Chiang's findings. (*See* AR 277.)

On June 27, 2011, Alvarez was voluntarily admitted to the University of New Mexico Psychiatric Center ("UNM") for intoxication, suicidal ideation, and lability. (AR 303.) Alvarez drank alcohol after two years of sobriety, relapsing two weeks prior and consuming hard liquor almost daily. (AR 298.) Alvarez had developed depression even though her home life was going relatively well, and she had decreased energy and poor sleep. (AR 280.) She consumed two pints

---

[3] A score between sixty-one and seventy is assessed when the patient is believed to have "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well, has some meaningful interpersonal relationships." *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34.

of hard liquor prior to admission. (*Id.*) Her family staged an intervention, and Alvarez made suicidal threats. (*Id.*) Paul E. Romo, M.D., assessed Alvarez with bipolar affective disorder, most recent episode depression without psychotic features; PTSD; a GAF of 28; and rule out alcohol dependence. (AR 309.) However, on June 29, 2011, Dr. Romo diagnosed Alvarez with bipolar affective disorder, most recent episode depression without psychotic features; PTSD; possible panic disorder; alcohol dependence; and a GAF of 28. (AR 287.) Dr. Romo found no alcohol withdrawal symptoms. (AR 288.) Upon discharge on June 30, 2011, Dr. Romo found that Alvarez had bipolar affective disorder, most recent episode depression with no psychotic features; alcohol dependence in full-sustained remission; PTSD; status post septal defect repair; and a GAF of 54. (AR 280.) Dr. Romo stated that Alvarez had "an isolated episode of relapse." (AR 281.)

After the ALJ's decision on September 20, 2011, Alvarez began treatment with E.B. Hall, M.D. (*See* Doc. 18 Exs. A-C.) Alvarez submitted to the Appeals Council records from Dr. Hall dated October 4, 2011, through September 25, 2012. (*See* Doc. 18 Ex. B at 1, Ex. C.) On a patient information form dated October 4, 2011, Alvarez stated that she consumed zero alcoholic drinks per week. (Doc. 18 Ex. B at 3.) She also asserted that she was not having any suicidal or homicidal thoughts. (*Id.* at 12.) Dr. Hall and Alvarez discussed bipolar disorder, ADD/ADHD, mood disorder, and PTSD. (*Id.* at 56.) Alvarez reported that she had awful dreams. (*Id.* at 58.) Dr. Hall observed pressured, rapid speech; a flight of ideas; a labile affect; and mood disorder. (*Id.*)

On October 26, 2011, Alvarez reported feeling tired, unmotivated, and depressed. (*Id.* at 57.) The following month, Alvarez complained of vivid, gory, violent nightmares that woke her up. (*Id.* at 51.) Alvarez stated that she hears voices and hallucinates during sleep and that, in the

8

morning, she has very low energy, feels depressed, and wants to stay in bed. (*Id.*) Alvarez reported on January 4, 2012, that her children hear her screaming at night and that she wakes up exhausted. (*Id.* at 48.)

Alvarez saw Dr. Hall on January 25, March 21, and April 8, 2012, during which Dr. Hall took progress notes. Alvarez continued to complain of nightmares and voices. (*Id.* at 46.) She had a dream that her boyfriend wanted to kill her. (*Id.* at 41.) Her depression came and went. (*Id.* at 43.)

On April 30, 2012, Dr. Hall completed a mental medical assessment of ability to do work-related activities. (*Id.* at 60-62.) The form instructed him to "consider the patient's medical history and the chronicity of findings as from a year prior to initial visit to current examination." (*Id.* at 60.) Dr. Hall found that Alvarez had moderate limitations in all areas of understanding and memory. (*Id.*) He also found that Alvarez had moderate limitations in all areas relating to sustained concentration and persistence, except marked limitations in her ability to work in coordination with or in proximity to others without being distracted by them. (*Id.*) Dr. Hall commented, "Mood Disorder dictates Disability." (*Id.*) With regard to social interaction, Dr. Hall found that Alvarez had marked limitations in her ability to interact appropriately with the general public; slight limitations in her ability to ask simple questions or request assistance; and moderate limitations in other social interaction measures. (*Id.* at 61.) Dr. Hall further found mostly moderate limitations in Alvarez's ability to adapt, including her ability to respond appropriately to changes in the workplace. (*Id.*)

In progress notes on May 2, 2012, Dr. Hall noted that Alvarez's moods were better but dependent on medicine to control. (*Id.* at 36.) Yet he also wrote that Alvarez's moods changed quickly and that she had a short temper and depression. (*Id.* at 37.) On May 30, 2012, Dr. Hall

noted that Alvarez felt that, on medication, she was having fewer "sleep paralyses episodes" where she could not pull herself awake during nightmares. (*Id.* at 33.) On July 31, 2012, Alvarez reported weird, recurring dreams and nightmares; trouble sleeping at night; and a tendency to get upset quickly, though she was attending the Family Workshop to learn anger control. (*Id.* at 30.)

On August 31, 2012, Dr. Hall completed an addendum to his mental medical assessment of Alvarez's ability to do work-related activities. (*Id.* at 62.) The addendum dealt with past and current substance abuse. (*See id.*) As to past alcohol abuse, Dr. Hall checked a box stating that Alvarez's "Mental Impairment(s) Is the Sole Cause of Her Inability To Function in a Work Setting." (*Id.*) With regard to current substance abuse, Dr. Hall marked that Alvarez did not have a current problem with substance abuse and again that Alvarez's mental impairment(s) were the sole cause of her inability to function in a work setting. (*Id.*) Dr. Hall also commented that "Mood disorder triggers major dysfunction in all areas of life. Panic attacks [a]ffect[] job performance; nightmares recurring." (*Id.*)

The last record is from September 25, 2012, where, again, Alvarez reported frightening night paralysis. (*Id.* at 25.)

### HEARING TESTIMONY

The ALJ held a hearing on April 2, 2011, at which Alvarez, her non-attorney representative, her community support worker, and a Vocational Expert ("VE") testified. (AR 39-63.)

Alvarez testified that when she worked in the past, she would get fired or into trouble because she became angry and could not control her actions. (AR 43.) For example, she once hit a person while working at McDonald's because the person threw fries at her. (*Id.*) Alvarez testified that people, including her family, do not want to be around her because of her temper

and tendency to be confrontational. (AR 43-44.) As such, she does not talk with anybody in her family. (AR 43.) Alvarez stated that she had a difficult relationship with her late father, a Vietnam veteran, because of his PTSD, alcoholism, and abuse. (AR 44.)

Alvarez testified that her mood swings up and down, that she constantly has many different things on her mind, and that she cannot concentrate. (AR 45-46.) She also explained that she has trouble sleeping at night and has anxiety. (AR 47.) Alvarez testified that she is committed to her treatment and has been thus committed for two to three years. (AR 47-48.) Before then, she would sometimes "self-medicate" with alcohol, but understands now that drinking alcohol was not helping her and was only making things worse. (AR 48, 52.) Now Alvarez takes lithium, Ambien, and Klonopin. (AR 48-49.) She testified that she experiences panic attacks, sometimes ten times a day. (AR 49.)

Alvarez discussed work she did late the previous year for RB Contractors. (AR 50.) Initially, she stocked shelves, but then she was assigned to the cash register, and she became so nervous that she could not count out correct change. (*Id.*)

Alvarez answered questions about a recent psychiatric hospitalization, wherein she arrived under the influence of alcohol. (AR 53.) Alvarez acknowledged that she had been under the influence of alcohol, but stated that prior to the hospitalization, she had not consumed alcohol for two-and-a-half years. (*Id.*) However, her son had become sick, her daughter got pregnant, and Alvarez was in an abusive relationship, prompting her to drink alcohol again. (AR 53-54.)

The ALJ next questioned the VE. (AR 54-57.) The ALJ asked the VE to assume a person of Alvarez's age, education, and work history who is limited to light-exertional work; cannot perform complex or detailed tasks and is therefore limited to unskilled types of work; cannot be exposed to heights or hazards; and can have only occasional public contact and occasional

interaction with supervisors and co-workers. (AR 55-56.) The VE testified that such a person could not perform Alvarez's previous work. (*Id.*) However, such a person could work as a mailroom sorter or clerk, shipping and receiving weigher, or garment bagger. (AR 56.) The ALJ then asked whether such a person could still perform these jobs if her ability to handle the stress of day-to-day work was compromised such that she might be absent two or three times a month. (AR 56-57.) The ALJ testified that such a limitation would eliminate the person's ability to hold the listed jobs. (AR 57.)

      Alvarez's community support worker, Bobby Wilson, then testified. (AR 58-62.) Wilson testified that he had been working with Alvarez for about an hour weekly for approximately eighteen months. (AR 58, 61.) He stated that he helped Alvarez with anger management, relapse prevention, and dealing with her emotions. (*Id.*) Wilson also helped Alvarez get a loan and pay her rent. (*Id.*) He testified that Alvarez experiences rapid thoughts at times and that he has to stop and redirect their conversations. (*Id.*) Other times, Alvarez is very depressed and isolates herself. (*Id.*) Wilson noted abuse by her Vietnam-veteran father. (AR 59.)

      Wilson affirmed that Alvarez had not consumed alcohol for almost three years until about three weeks earlier, when she drank. (*Id.*) Wilson found no obvious reason that Alvarez would relapse into drinking again and opined that she was committed to her treatment. (AR 59-60.) He testified that Alvarez volunteered at her son's school, but that she became too stressed. (AR 60-61.) Wilson did not know about her RB Contractors job. (AR 61.) However, he stated that he did not think it was realistic for Alvarez to work due to her inability to concentrate and her PTSD. (AR 61-62.)

## THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Alvarez's application for benefits according to the sequential evaluation process. (AR 27-34.) At the first step, the ALJ found that Alvarez had not engaged in substantial gainful activity since February 23, 2010, the application date. (AR 27.) Then, at the second step, the ALJ concluded that she suffers from the severe impairments of a bipolar affective disorder, a major depressive disorder, PTSD, and a history of alcoholism. (AR 28.) At step three, the ALJ found that Alvarez's mental impairments, in the presence of substance abuse, met Listing 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d)). (AR 28.) The ALJ stated that the records reflected that Alvarez's severe mental impairments are affected by her alcohol abuse. (AR 30.) The ALJ concluded that, in the absence of alcohol use, Alvarez would still have severe mental impairments. (*Id.*) However, the ALJ found that Alvarez's combination of severe impairments did not equal one of the listed impairments in the absence of alcohol use. (AR 30.)

The ALJ then determined Alvarez's RFC in the absence of substance abuse. The ALJ found that Alvarez could perform light exertional work, with no complex or detailed tasks, no exposure to heights or hazards, only occasional interaction with the general public, and only occasional interaction with co-workers and supervisors. (AR 31.) The ALJ gave significant weight to the consultative examination performed by psychiatrist Ann Ortiz, M.D. (AR 32-33.) The ALJ noted Dr. Ortiz's diagnoses, including major depression, recurrent mild; alcohol dependence sustained full remission; alcohol induced mood disorder; alcohol induced anxiety disorder; alcohol induced sleep disorder; chronic alcohol dependence; and a GAF of 65. (AR 32.) The ALJ found that Dr. Ortiz's opinions were consistent with the overall record and pointed out

that most of Alvarez's treating source opinions were from "periods of active substance abuse or in the immediate recovery period." (AR 33.)

The ALJ concluded that Alvarez could not perform past relevant work even in the absence of alcohol use. (AR 33.) Nonetheless, at step five, the ALJ found that considering Alvarez's age, education, work experience, RFC, and the testimony of the VE, Alvarez could perform the work of a mail room sorter, shipping and receiving weigher, and garment bagger. (AR 34.) As the ALJ determined that Alvarez could perform jobs existing in substantial numbers in the national economy, the ALJ concluded that Alvarez was not disabled. (AR 46-47.) The ALJ noted that he found that a substance use disorder was a contributing factor material to the determination of disability. (AR 34.)

Alvarez appealed the decision to the Appeals Council, but the Council found that Alvarez's reasons for disagreeing with the hearing outcome did not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 1-5.) The Appeals Council stated that it looked at additional evidence dated after the ALJ's decision from Matthew Dahlstan, LPCC, and from E.B. Hall, M.D. (AR 2.) However, because this information was from after September 20, 2011, when the ALJ issued his decision, the Appeals Council found that the information was about a later time and would not affect a determination about disability existing on or before September 20, 2011. (*Id.*)

## DISCUSSION

Alvarez makes two arguments in support of reversing and remanding her case. First, Alvarez argues that the Appeals Council erred in declining to consider the evidence dated October 4, 2011, through September 25, 2012, from Dr. Hall. Second, Alvarez argues that the ALJ's analysis and conclusion that she could work if she abstained from alcohol was contrary to

14

law, and that it is her mental impairment, not alcohol use, that is disabling. Because I recommend that the Court find that the Appeals Council erred in declining to consider the records from Dr. Hall and because such records directly speak to alcohol's impact on a disability determination, I do not reach Alvarez's second argument.

Evidence not before the ALJ may be presented to the Appeals Council and "becomes part of the administrative record to be considered when evaluating the Secretary's decision for substantial evidence." *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994). However, this "new evidence" must relate to the period on or before the date of the ALJ's decision. *See id.* at 858; 20 C.F.R. § 416.1470(b) ("[I]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."). "Whether [evidence] qualif[ies] as new, material, and chronologically pertinent is a question of law subject to [the Court's] *de novo* review." *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003) (citation omitted); *see also Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004).

Evidence is "new" when it is not "duplicative or cumulative." *Threet*, 353 F.3d at 1191 (citation omitted). In *Threet*, the court found that evidence of claimant's further deterioration of her shoulder was new evidence that was not available to the ALJ at the time of his decision and was therefore not duplicative or cumulative. *Id.* Evidence is "material" "if there is a reasonable possibility that [it] would have changed the outcome." *Id.* (citation omitted). In *Threet*, the court found materiality where the new evidence was contrary to the ALJ's determination that the claimant obtained no further medical treatment and that her condition had improved. *Id.*

The records from Dr. Hall are new—not duplicative or cumulative—because the evidence was not available to the ALJ at the time of her decision. With regard to whether the

15

evidence is material, the Commissioner argues that Dr. Hall's August 2012 opinion that "mood disorder triggers major dysfunction in all areas of life" and "panic attacks [a]ffect[] all areas of life" is inconsistent with his own treatment notes and that Dr. Hall's evaluation of Alvarez's past alcohol abuse is inconsistent with the evidence. While the Commissioner cites Dr. Hall's findings in his October 4, 2011, mental status exam that Alvarez was well-groomed, cooperative, and alert; demonstrated normal cognition, thought content, and language; and was not suicidal or homicidal, the Commissioner completely neglected other findings in the same exam that related to a mood disorder. Dr. Hall found that Alvarez was hyperactive/agitated, with pressured/rapid speech, a flight of ideas, an anxious and irritable mood, and a labile affect. (Doc. 18 Ex. B at 58.) Notes from multiple other visits to Dr. Hall indicate that Alvarez continued to have violent nightmares, night paralysis, hallucinations, exhaustion during the day, anger-management problems, and depression. (*See* Doc. 18 Ex. B.)

Further, the Commissioner points out that Dr. Hall checked "no" with regard to the question in his substance abuse addendum asking, "To your knowledge has the claimant had a [past] problem with alcohol or other substance abuse?" (*See* Doc. 18 Ex. B at 62.) The "no" check appears to be an error, because the next question asked, "If yes, when was the last time she abused alcohol or other substances?", and Dr. Hall wrote "ETOH [alcohol] – 3 years ago." (*Id.*) As such, I find unpersuasive the Commissioner's argument that the evidence is immaterial because of inconsistencies between Dr. Hall's opinion compared to his treatment notes and the record. Dr. Hall, a treating psychiatrist, opined that Alvarez had mental impairments that were the sole cause of her inability to function in a work setting both in the past—he was directed by the form to evaluate her history back to October 2010—and at present, completely apart from any alcohol use. As the ALJ concluded that alcohol use was a factor material to the

determination of disability, I conclude that there is a reasonable possibility that the records from Dr. Hall would have changed the outcome.

As noted, Dr. Hall evaluated Alvarez's ability to do work-related activities back to one year prior to Alvarez's initial visit with him. Alvarez's first visit with Dr. Hall was on October 4, 2011. (*See* Doc. 18 Ex. B at 4.) The ALJ's decision was issued on September 20, 2011. (*See* AR at 35.) Therefore, Dr. Hall's opinion related back to a period almost a year before the ALJ's decision. The Commissioner's citation to *Wall v. Astrue* in support of her argument against relation back is unpersuasive. 561 F.3d 1048 (10th Cir. 2009). In that case, the court found that a completely new head injury sustained after the ALJ's decision did not relate back to the period leading up to the ALJ's decision. *Id.* at 1064-65. Here, in contrast, Alvarez had been diagnosed with mental impairments, such as bipolar disorder, no later than October 1, 2006. (*See* AR 221.)

When qualifying new evidence is submitted, the Appeals Council must consider the entire record, including the qualifying new evidence, to determine whether the ALJ's decision "is contrary to the weight of the evidence currently of record." 20 C.F.R. § 416.1470(b); *see Chambers*, 389 F.3d at 1143. After the Appeals Council reviews the entire record—including the qualifying new evidence—under the standard provided in 20 C.F.R. § 416.1470(b), the court may "properly review [a denial of benefits] under the deferential substantial-evidence standard." *Chambers*, 389 F.3d at 1143. However, "[i]f the Appeals Council fails to consider qualifying new evidence, the case should be remanded for further proceedings." *Id.* (quotation omitted); *see also Threet*, 353 F.2d at 1191 ("If . . . the Appeals Council did not evaluate the entire record including the new evidence, that failure constitutes substantial legal error necessitating a remand for further proceedings . . . .").

In *Padilla v. Colvin*, the Appeals Council found that new evidence was chronologically irrelevant and therefore did not impact its disability determination for Padilla. 525 F. App'x 710, 711 (10th Cir. 2013) (unpublished). However, the court reversed and remanded because it found that the new evidence did relate back to the period before the ALJ's decision, and therefore, the Appeals Council should have considered the new evidence. *Id.* at 713. Such is the case here. By stating that the "new information is about a later time [and] [t]herefore, . . . does not affect the decision about whether [Alvarez] was disabled beginning on or before September 20, 2011," the Appeals Council indicated that it did not consider the evidence under the standard set forth in 20 C.F.R. § 416.1470(b). I therefore recommend that the Court find that the Appeals Council erred in declining to consider the records from Dr. Hall and remand the case so that the SSA can consider the entire record, including the qualifying new evidence, to determine whether the ALJ's decision "is contrary to the weight of the evidence currently of record." 20 C.F.R. § 416.1470(b).

## CONCLUSION

I recommend that the Court find that the ALJ erred in failing to consider new, material, and chronologically pertinent evidence in the form of records from Dr. Hall made after the ALJ's decision and submitted for review by the Appeals Council. I therefore recommend that the Court remand this case to the SSA with the instruction that the Appeals Council consider the entire record, including the records from Dr. Hall, pursuant to the standard set forth in 20 C.F.R. § 416.1470(b) and consistent with this Proposed Findings and Recommended Disposition.

> **THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

_____
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.